**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AARON C. PASSMORE and JERRY O. GRIFFIN, | ) ) ) | |
| Plaintiffs, | ) ) | No. 14-cv-09868 |
| v. | ) ) | Judge Andrea R. Wood |
| BRAD JOSEPHSON, et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Aaron C. Passmore and Jerry O. Griffin are pretrial detainees confined at Will

County Adult Detention Facility ("WCADF"). Plaintiffs claim that they suffered skin irritations

on their genitals from dirty underwear and were denied medical treatment for their symptoms.

Plaintiffs thus have brought this lawsuit pursuant to 42 U.S.C. § 1983, alleging violations of their

rights under the Fourteenth Amendment and naming as Defendants Will County, WCADF

Warden Brad Josephson, in his official capacity, and current and former Will County employees

Michael O'Leary, Brian Fink, Mike Kelley, and Kelly Bargo, in their individual capacities.[1]

Defendants now move for summary judgment. (Dkt. No. 69.) For the following reasons, their

motion is granted.

---

[1] Plaintiffs have styled their Second Amended Complaint as alleging violations of their rights against cruel and unusual punishment under the Eighth Amendment. As Defendants point out in their motion for summary judgment, however, Plaintiffs are pretrial detainees and thus their conditions of confinement claims arise under the Due Process Clause of the Fourteenth Amendment. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012). But there is "little practical difference, if any, between the standards applicable to pretrial detainees and convicted inmates when it comes to conditions of confinement claims." *Smith v. Dart*, 803 F.3d 304, 309–10 (7th Cir. 2015).

# BACKGROUND

Unless otherwise noted, the following facts are undisputed.

## I.     The Parties

At all times relevant to their complaint, Plaintiffs were pretrial detainees at WCADF. (Defs.' R. 56.1 Stmt. of Mat. Facts in Support of Summ. J. ("DSMF") ¶ 1, Dkt. No. 71.) Defendant Will County is a unit of local government operating within the State of Illinois. (*Id.* ¶ 6.) Defendant Kelley serves as Sheriff of Will County. (*Id.* ¶ 2.) Defendant O'Leary previously served as Warden of WCADF but later was succeeded in that position by Defendant Josephson. (*Id.* ¶ 3.) Defendant Fink served as Deputy Chief of Operations at WCADF, and Defendant Bargo, an employee of the Will County Sheriff's Office, served as the laundry assistant there. (*Id.* ¶¶ 4, 5.) Bargo has been employed as a laundry assistant since August 2014. (*Id.* ¶ 54.) Her duties include supervising "tenders," detainees who are responsible for doing laundry at WCADF. (*Id.*) Bargo reports to the Deputy Chief of Support Services. (*Id.* ¶ 55.)

## II.    WCADF's Laundry Process

WCADF's laundry process was established before Bargo began working as a laundry assistant. (*Id.* ¶ 56.) WCADF uses four washing machines to launder detainees' underwear, socks, T-shirts, towels, and sheets. (*Id.* ¶ 12.) These clothing items for all 800–900 inmates are mixed together indiscriminately. (Defs.' Resp. to Pls.' Supplemental R. 56.1 Stmt. of Disputed [*sic*] Mat. Facts ("DRMF") ¶ 82, Dkt. No. 76.) No one checks the underwear for urine or fecal stains before placing it into the washing machine. (DSMF ¶ 16.) According to Bargo, soap and bleach are added to the washing machines automatically. (*Id.* ¶ 13.) The soap and bleach lines are checked and filled by the maintenance staff. (*Id.* ¶¶ 13–14.) And the machine does not give an alert or warning if it is low on soap or bleach. (Pl.'s R. 56.1 Resp. to Defs.' Stmt. of Mat.

Facts ("PRMF") ¶ 13, Dkt. No. 72-1.) Bargo does not know how much soap or bleach goes into each load. (*Id.*) She checks whether soap is present by looking for bubbles, and if she does not see any, she turns off the machine and notifies the maintenance staff. (DSMF ¶ 14.) However, Bargo cannot visually check in the same way whether bleach is present. (*Id.* ¶ 15.) Passmore testified that he could not smell any soap or bleach on the stained underwear. (PRMF ¶ 69.)

Once laundry is washed and dried, it is folded, placed on the laundry cart, and randomly distributed to the detainees. (DSMF ¶ 17.) Tenders are instructed to look at the underwear as they fold it and check for damage or stains. (*Id.* ¶ 18.) Tenders are also instructed that if they would not wear the underwear themselves, they should not put it on the cart for distribution. (*Id.* ¶ 19.) For example, if he sees urine or fecal stains, the tender should dispose of the underwear and log the disposal by indicating size and color. (*Id.* ¶¶ 20–21.)

Detainees exchange their clothing items, including underwear, twice per week. (*Id.* ¶ 8.) Tenders bring carts of laundered clothing into the general housing units and distribute the laundry under the supervision of Bargo or another laundry assistant. (*Id.* ¶ 9.) At this point, detainees exchange their worn clothing items and check their newly-received items for sizing and damage, such as holes or stains. (*Id.* ¶¶ 10–11.) According to Bargo, detainees occasionally wish to exchange their underwear due to damage, but no one has ever complained to her about stains. (*Id.* ¶¶ 58, 61.) Plaintiffs dispute this claim, as both testified that they complained to Bargo about receiving stained underwear but she did not allow them to exchange it. (PRMF ¶¶ 58–59.) Bargo further testified that no detainee has ever complained to her about a genital rash, but if someone had done so, she would have offered him a "bio bag" for his underwear. (DSMF ¶ 61.)

### III.    Passmore's Claims

Passmore became a pretrial detainee at WCADF on April 7, 2014. (*Id.* ¶ 24.) From the start, he received stained underwear, but he did not start experiencing any symptoms until June 2014. (*Id.*) That month, Passmore asked to exchange his stained underwear, but Bargo denied his request. (*Id.* ¶ 25.) Passmore had already left the distribution area and returned to his cell before seeking the exchange, however. (*Id.* ¶ 26.) And Bargo testified that she may refuse an exchange if the detainee fails to check the item before accepting it and leaving. (*Id.* ¶ 60.) A few days later, Passmore developed a red, itchy rash on his groin area and on his inner thighs and buttocks, which lasted a couple of months. (*Id.* ¶ 27.) The rash started off as "bumps," then "turned reddish and started to become raw." (DRMF ¶ 68.) According to Passmore, the rash affected his ability to move and walk around and caused a stinging sensation when his thighs rubbed together and when he defecated. (PRMF ¶ 35.) Passmore had never experienced a genital rash before his admission to WCADF. (DRMF ¶ 75.)

Then, in October or November 2014, Passmore developed another rash in the same area, which lasted for about two or three months. (DSMF ¶ 28.) Passmore testified that this time, he complained of the "dirty, brown stained underwear" to Bargo and asked for an underwear exchange before leaving the distribution area, but Bargo again denied his request. (DSMF ¶ 29; Pls.' Stmt. of Add'l Facts that Raise a Genuine Dispute ("PSAF") ¶ 77, Dkt. No. 72-1.) Passmore subsequently developed a third rash in March 2015, after he again received stained underwear. (DSMF ¶ 30.) At this point, Passmore tried to wash the underwear but ultimately decided to stop wearing it altogether. (*Id.* ¶ 31.)

Passmore put in three healthcare requests in October and November 2014 regarding the rash. (*Id.* ¶ 32.)  He also filed grievances about the dirty underwear in November 2014, March

2015, and April 2015, but the issue was never addressed. (DRMF ¶ 73.) In addition, Passmore spoke to a nurse about the rash in November 2014, but he did not consult a doctor. (DSMF ¶ 33.) On October 16 and 21, 2014, Passmore saw a doctor for low back pain and attempted to discuss his rash, but the doctor advised him to submit a separate request slip. (*Id.*)

### IV. Griffin's Claims

Griffin became a pretrial detainee at WCADF in May 2014. Upon his arrival, Griffin was assigned to the medical unit or "M-pod" at WCADF, where he stayed until August 2014. (*Id.* ¶ 46.) After his arrival at WCADF, Griffin immediately began experiencing issues with dirty underwear. (*Id.* ¶ 36.) He developed "bumps" on the right side of his genitals and in between his thighs for a little over a week. (*Id.* ¶ 41.) However, even though Griffin told the doctor about his rash and submitted one or more medical slips about it, he did not receive any medical attention. (*Id.*) In August and September 2014, when Griffin was no longer housed in the M-pod, he requested an underwear exchange, but Bargo would not allow it. (*Id.* ¶ 39.) When Griffin washed the underwear on his own, he noticed that his symptoms improved. (*Id.* ¶ 45.) Like Passmore, Griffin had never experienced a genital rash before his admission to WCADF. (DRMF ¶ 80.)

Griffin complains of several other incidents of mistreatment in addition to the dirty underwear issue. As mentioned above, Griffin was assigned to the M-pod upon his arrival at WCADF in May 2014 until August 2014; this was due to his need for treatment for an orbital (eye socket) fracture. (DSMF ¶ 46.) Griffin claims that WCADF medical staff mistreated his fracture and denied him pain medication. (*Id.*) But Griffin's orbital fracture was seen by medical staff every two weeks. (*Id.*) Griffin was also taken to Loyola Hospital twice during this time period, where doctors checked his vision. (*Id.* ¶ 47.) Griffin was offered Tylenol for his eye pain, but he refused. (*Id.* ¶ 49.)

In addition, Griffin claims that while he was housed in the M-pod, the lights would stay on all night, and unidentified staff entering the unit either intentionally slammed the doors or failed to prevent the doors from slamming shut. (*Id.* ¶ 52.) These conditions gave Griffin a headache. (*Id.*) Griffin also did not have access to the outside while housed in the M-pod, which he claims deprived him of fresh air. (*Id.* ¶ 53.)

Finally, Griffin asserts that he was humiliated during several strip searches. On October 10, 14, and 15, 2014, Griffin was subjected to strip searches as part of a unit-wide shakedown. (*Id.* ¶ 50.) The strip searches were performed by male corrections officers, but several female corrections officers were also present at that time. (*Id.* ¶¶ 50–51.) The female officers were walking past Griffin's cell or located 10 to 20 feet away from the area. (*Id.* ¶ 51.)

## DISCUSSION

In their motion for summary judgment, Defendants argue that the undisputed evidence shows Plaintiffs cannot prove their claims, that Will County is not liable for the alleged constitutional violations, and that the individual Defendants are protected by qualified immunity. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment will be denied if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. However, a nonmoving party "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotation marks omitted). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with

sufficient evidence to create genuine issues of material fact to avoid summary judgment."

*McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

### I.     Defendant Will County

As a preliminary matter, Plaintiffs have sued Josephson in his official capacity as Sheriff of Will County, "which is effectively the same as having brought suit against the County . . . itself." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1071 (7th Cir. 2012).[2] Accordingly, the Court dismisses the claims against Josephson as duplicative of the claims against Will County.

### II.     Count I – Passmore's § 1983 Claim

Section 1983 provides that a person may not be deprived of any constitutional right by an individual acting under color of state law and authorizes plaintiffs to sue persons who have violated such rights. *See Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1970) (internal quotation marks omitted). Under the Constitution, pretrial detainees "are entitled to confinement under humane conditions which provide for their basic human needs." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012) (internal quotation marks omitted).

Here, Passmore asserts that Defendants subjected him to cruel and unusual punishment in violation of his Fourteenth Amendment rights when they issued him dirty underwear and refused to allow him to exchange it and when they ignored his requests for medical treatment for his

---

[2] In *Carver v. Sheriff of LaSalle County*, 324 F.3d 947 (7th Cir. 2003), the Seventh Circuit certified as a question to the Illinois Supreme Court "whether, and if so when, Illinois requires counties to pay judgments entered against a sheriff's office in an official capacity." The Illinois Supreme Court answered that, "[b]ecause the office of the sheriff is funded by the county, the county is therefore required to pay a judgment entered against a sheriff's office in an official capacity." *Carver v. Sheriff of LaSalle Cty., Ill.*, 787 N.E.2d 127, 141 (Ill. 2003). Thus, in its own *Carver* decision, the Seventh Circuit held that "[b]ecause state law requires the county to pay, federal law deems it an indispensable party to the litigation." 324 F.3d at 948.

genital rashes. In other words, Passmore brings a claim for unconstitutional conditions of confinement based on dirty underwear and a claim for deprivation of medical care based on his untreated rashes.

### A. Conditions of Confinement Claim

To evaluate a claim that the conditions of a plaintiff's confinement are unconstitutional, the Court conducts a two-step inquiry: first, the Court considers whether the adverse conditions of which the plaintiff complains are "sufficiently serious," such that the acts or omissions of prison officials giving rise to the conditions deprive the plaintiff of a "minimal civilized measure of life's necessities." *Id.* at 664–65. If so, the Court then inquires whether the defendants have been "deliberately indifferent to the adverse conditions." *Id.* at 665. This is a "demanding test." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016).

### 1. Sufficiently Serious

The Seventh Circuit has not expressly addressed whether the issuance of dirty underwear constitutes a constitutional violation; however, other federal courts faced with this question have concluded that it does not. *See, e.g.*, *Crawford v. Caddo Corr. Ctr.*, No. 5:14-cv-3198, 2015 WL 3622689, at *3 (W.D. La. June 9, 2015) (finding no Eighth Amendment injury despite plaintiff's allegations that he "received boxer shorts with feces stains in the rear and unidentifiable stains in front" that caused "jock-itch serious enough to cause bleeding"); *Sandstrom v. Hoffer*, No. 08-3245-SAC, 2011 WL 4553067, at *4 (D. Kan. Sept. 29, 2011) (holding that plaintiff who was issued "laundered but stained underwear" failed to state conditions of confinement claim); *Tapp v. Proto*, 718 F. Supp. 2d 598, 619 (E.D. Pa. 2010) (holding that inmate forced to wear dirty, torn, and stained underwear failed to state constitutional injury).

Yet a few aspects of Passmore's situation suggest a different result might be warranted here. First, Passmore has provided evidence that he was exposed to urine and feces, which the Seventh Circuit has consistently held to be proof of a sufficiently serious deprivation. *See Myers v. Ind. Dep't of Corr.*, 655 F. App'x 500, 503–04 (7th Cir. 2016) (affirming dismissal of Eighth Amendment claim where prisoner alleged he received inadequately washed clothing for four years but suggesting that such claim could be stated based on exposure to clothing residue that "might transmit serious diseases," such as urine and human waste);[3] *Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007) (per curiam) (summarizing cases where allegations of exposure to human waste survived summary judgment). Moreover, Passmore testified that he suffered a physical reaction in the form of an itchy and painful genital rash. *Compare Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988) (rejecting plaintiff's claim where he "experienced considerable unpleasantness, [but] he suffered no physical harm") *with Martin v. Lane*, 766 F. Supp. 641, 648 (N.D. Ill. 1991) (denying summary judgment where plaintiff showed that denial of access to shower caused him to develop a body rash because "allegations of resulting physical harm makes [*sic*] this claim actionable").

Nonetheless, even viewing the totality of the record presented and drawing all reasonable inferences in Passmore's favor, this Court cannot conclude that the adverse conditions Passmore faced with respect to the dirty underwear were sufficiently serious to support his constitutional claim. While Passmore contends that he was prevented from exchanging the dirty underwear, he admits that he was not forced to wear it and he eventually decided not to do so. *Cf. Isby v. Clark*, 100 F.3d 5002, 505–06 (7th Cir. 1996) (recognizing potential constitutional violation where

---

[3] *Myers* is an unpublished Seventh Circuit order issued after January 1, 2007. Although not precedential, the order's reasoning is persuasive and provides a useful point of comparison here. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b). The same reasoning applies to the Court's subsequent citations to the Seventh Circuit's orders in *Smith v. Roper*, *Gevas v. Mitchell*, *Myrick v. Anglin*, *Norwood v. Ghosh*, *Jerricks v. Schomig*, and *Vasquez v. Frank*.

plaintiff was locked in segregation cell with urine and feces on walls); *Johnson v. Pelker*, 891 F.2d 136, 139–40 (7th Cir. 1989) (same). In addition, Passmore admits that he had ample opportunity to wash the underwear, and both he and Griffin testified that they did so. *See Gates v. Cook*, 376 F.3d 323, 342 (5th Cir. 2004) (finding no constitutional injury where inmates were required to wash their own clothes with bar soap); *Darris v. Mazzaie*, No. 12-cv-01559-REB-CBS, 2013 WL 5291940, at *10 (D. Colo. Sept. 17, 2013) (finding no constitutional injury where plaintiff "does not allege that he was unable to bathe or wash his clothes himself"); *Myers v. City of New York*, No. 11-Civ-8525(PAE), 2012 WL 3776707, at *8 (S.D.N.Y. Aug. 29, 2012) (finding no constitutional injury where prisoner had opportunity and means to clean his own clothes). Furthermore, Passmore's possession of the dirty underwear was always of a limited duration, as WCADF circulated newly-laundered sets of underwear twice per week. *Gordon v. Sheahan*, No. 96 C 1784, 1997 WL 136699, at *8 (N.D. Ill. Mar. 24, 1997) ("Having to wear the same clothes for two or three weeks is not a deprivation of constitutional magnitude."); *Martin v. Lane*, 766 F. Supp. 641, 648 (N.D. Ill. 1991) (holding that deprivation of laundry services for between three and eighteen days is not sufficiently serious injury); *see also Goss v. Bd. of Cty. Comm'rs of Creek Cty.*, No. 13-CV-0374-CVE-TLW, 2014 WL 4983856, at *14 (N.D. Okla. Oct. 6, 2014) (holding that plaintiff forced to wear urine-stained pants for three days did not suffer sufficiently serious injury).

Finally, while Passmore asserts that he developed an itchy, painful rash on his genitals, he has not provided evidence showing that his rash was particularly serious. A medical condition is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). Passmore has not shown that his rash was diagnosed by a

physician; his only evidence is after-the-fact opinion testimony from a nurse practitioner, Tiffany

Ferguson, that the symptoms Passmore described are consistent with irritant contact dermatitis.

But Ferguson also testified that the dermatitis was not chronic or life-threatening and did not

pose a risk of lingering disability. And Passmore's own testimony demonstrates that the rash

faded on its own after a few months. Nor has Passmore offered any evidence or testimony that a

lay person would have perceived that his rash obviously required medical attention. *See, e.g.*,

*Ware v. Fairman*, 884 F. Supp. 1201, 1206 (N.D. Ill. 1995) (describing plaintiff's rash as not

"serious" condition); *see also Tasby v. Cain*, 86 F. App'x 745, 746 (5th Cir. 2004) ("[Plaintiff's]

assertion that he suffered a rash as a result of the [prison's] back restraints . . . does not establish

that he suffered serious harm"); *Thompson v. Paleka*, No. 17-00531 SOM-KJM, 2017 WL

5309608, at *6 (D. Haw. Nov. 13, 2017) (finding that plaintiff failed to allege facts showing that

his rash, which he attributed to prison's dirty showers, was sufficiently serious); *Vance v.

Shearin*, No. ELH-14-272, 2014 WL 470075, at *3 (D. Md. Feb. 4, 2014) (holding that

plaintiff's genital rash does not constitute serious medical need). At most, Passmore presented

testimony from Ferguson that dermatitis is treated by removing the irritant and providing gentle

skin care, such as topical corticosteroids, emollient creams, and oatmeal baths. (PRMF ¶ 67.)

To be clear, the Court does not wish to minimize the fact that Passmore experienced

significant personal discomfort. But ultimately, based on the facts at hand and abundant federal

case law addressing similar situations, the issuance of dirty underwear to Passmore and refusal to

allow him to exchange it was not sufficiently serious to support his conditions of confinement

claim.

## 2. Deliberate Indifference and *Monell*

Even if Passmore's claim regarding the dirty underwear satisfied the first factor of his constitutional claim, it would still fail because he has not shown deliberate indifference. "An official is deliberately indifferent when he is subjectively aware of the condition or danger complained of, but consciously disregards it." *Rice*, 675 F.3d at 665; *Gray*, 826 F.3d at 1008 ("The warden must have known of and disregarded an excessive risk to inmate health or safety." (internal quotation marks and alteration brackets omitted)). In addition, Defendants must have been "both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and he must also have drawn the inference." *Gray*, 826 F.3d at 1008. Plaintiffs have pointed to no such evidence; at most, Passmore complained to Bargo about the dirty and stained underwear but not about any of the side effects he experienced. No reasonable jury could infer from these facts that Bargo "acted with the equivalent of criminal recklessness" regarding Passmore's safety. *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008).

As to the other individual Defendants, the record contains no evidence that any of them had personal knowledge of or were personally responsible for the dirty underwear. *See Smith v. Roper*, 12 F. App'x 393, 397 (7th Cir. 2001) ("A prison official cannot incur § 1983 liability unless that officer is shown to be personally responsible for a deprivation of a constitutional right." (internal quotation marks omitted)); *see also Tesch v. Cty. of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998) ("Because the officers did not inflict a constitutional injury on [plaintiff], the County, Chief, and the [supervisors] cannot be liable to [plaintiff]."). While Passmore submitted health care requests and grievances about his rash, "non-medical personnel not directly involved in an inmate's medical care are usually not liable for their review and/or denial of medical grievances." *Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1013 (N.D. Ill. 2015); *see also Gevas v.*

*Mitchell*, 492 F. App'x 654, 656 (7th Cir. 2012) (dismissing claim where "[Plaintiff] alleges no personal involvement by the warden outside of the grievance process").

Similarly, even if Passmore could show that he suffered a constitutional deprivation, Will County would still be entitled to summary judgment because Passmore has not presented evidence that his injury was the result of an existing policy, rather than an isolated incident. In *Monell v. Department of Social Services*, 463 U.S. 658 (1978), the Supreme Court held that a § 1983 claim may be brought against a local governmental entity for the actions of its employees only if those actions were taken pursuant to an unconstitutional policy or custom. *Id.* at 694. Passmore contends that the WCADF had an unconstitutional policy of requiring all inmates to share underwear with each other. However, Passmore offers no legal authority holding that such a policy constitutes cruel and unusual punishment, and this Court is not convinced. *See Crawford*, 2015 WL 3622689, at *2 (rejecting plaintiff's Eighth Amendment claim based on prison's communal laundry system). Moreover, the record contains no evidence that any inmate other than Passmore and Griffin experienced genital rashes. *See Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994) ("This temporary discomfort affecting only a few prisoners hardly violates common notions of decency.").

Passmore also characterizes as unconstitutional Bargo's reliance on the maintenance staff to ensure that the laundry machines have adequate soap and bleach and her failure to inspect every piece of underwear before distribution. But Passmore offers no legal support for his position, and the Constitution does not require detention facilities to go to such extensive lengths. *See Tesch*, 157 F.3d at 476 (rejecting Eighth Amendment claim where plaintiff "was not denied any of his basic human necessities; he just did not receive the level of comfort that he demanded"); *Miller v. Brown*, No. 07-2020(JLL), 2007 WL 1876506, at *4 (D.N.J. June 26,

2007) ("While any person's desire for spotless cleaning, perfect washing facilities and weekly laundry service is understandable, lack of such niceties cannot amount to a violation of constitutional magnitude."). Indeed, Passmore does not dispute that Will County's policy requires the use of soap and bleach in every load of laundry and the disposal of any underwear stained with urine or feces or that the tender would not himself wear. In addition, if a detainee receives underwear with damage or stains, he may request an exchange, which will be granted at the discretion of laundry staff.

Therefore, in sum, the Court finds that summary judgment is warranted as to all Defendants on Passmore's conditions of confinement claim.

### B.    Deprivation of Medical Care Claim

Passmore also claims that Defendants violated his constitutional rights by denying him medical attention for his genital rashes. To demonstrate a triable issue of fact as to whether Defendants unconstitutionally deprived him of medical care, Passmore must show an objectively serious medical condition to which a state official was deliberately indifferent. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828–29 (7th Cir. 2009).

The record here provides no indication who prevented Passmore from receiving medical attention.[4] In addition, for reasons explained above, Passmore has failed to adduce sufficient evidence that his genital rash was an objectively serious medical condition. A reasonable jury could not conclude that the alleged failure to treat Passmore's medical condition rose to the level of deliberate indifference to a serious medical need. *Cf. Myrick v. Anglin*, 496 F. App'x 670, 674 (7th Cir. 2012) (holding that plaintiff suffering from hernia, herpes virus, and excruciatingly painful MRSA skin infections should have received medical treatment); *Gutierrez v. Peters*, 111

---

[4] Passmore claims only that he submitted three healthcare request slips regarding the rash but never saw a doctor about it. (DSMF Ex. A at 43–44.)

F.3d 1364, 1371 n.5 (holding that plaintiff who experienced "excruciating pain, a purulent draining infection, and fever in excess of 100 degrees" should have received medical treatment).

Therefore, the Court grants summary judgment in Defendants' favor on Passmore's deprivation of medical claim as well.[5]

## III. Count II – Griffin's § 1983 Claim

The Court turns next to Count II, Griffin's § 1983 claim. Griffin echoes Passmore's allegations regarding Defendants' issuance of dirty underwear, refusal to allow him to exchange the underwear, and denial of medical treatment for his rash. For the same reasons as with respect to Passmore, Griffin's claims relating to the dirty underwear and resulting rash do not rise to the level of a constitutional injury. But Griffin also contends that Defendants failed to treat his orbital fracture adequately, denied him fresh air, and left the lights on and slammed doors at night while he was trying to sleep in the M-pod.[6] Moreover, Griffin asserts that after he was moved out of the M-pod, Defendants caused him to be strip-searched in front of female correctional officers on multiple occasions. In addition to considering these additional claims on their own merits, the Court also must consider whether the totality of Griffin's claimed conditions of confinement is enough to survive summary judgment. *See Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) ("[C]onditions of confinement, even if not individually serious enough to work constitutional violations, may violate the Constitution in combination when they

---

[5] Passmore does not present any separate arguments in opposition to summary judgment on his *Monell* claim for deprivation of medical care. Therefore, the Court considers any such argument waived. *See Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004); *Swanigan v. Trotter*, 645 F. Supp. 2d 656, 681 (N.D. Ill. 2009).

[6] The complaint also includes allegations that Defendants ate in Griffin's cell. However, it is unclear how such conduct could constitute a constitutional violation. More importantly, Griffin does not address this alleged misconduct in his response to Defendants' summary judgment motion, so the Court considers the claim waived. *Kramer*, 355 F.3d at 964 n.1.

have 'a mutually enforcing effect that produces the deprivation of a single, identifiable human need.'" (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991))).

### A. Mistreatment of Orbital Fracture

Griffin claims that he was denied adequate medical care for his orbital fracture. However, he offers no proof in support of this allegation. The record demonstrates that Griffin was housed in the M-pod and evaluated by medical staff every two weeks. Twice during his first two months at WCADF Griffin was also taken to Loyola Hospital, where doctors checked his vision. *See, e.g.*, *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (granting summary judgment in favor of defendant-doctor who correctly diagnosed condition, ordered further testing, and consulted with plaintiff-prisoner about treatment). Finally, Griffin was offered Tylenol for his eye pain, which he refused. *See, e.g.*, *Norwood v. Ghosh*, 723 F. App'x 357, 364 (7th Cir. 2018) (finding no deliberate indifference where defendant-doctor denied plaintiff's request for Vicodin and prescribed Tylenol-3 instead); *cf. Walker*, 293 F.3d at 1039 (denying summary judgment as to defendant-nurse who refused to administer prescribed plaintiff-prisoner's pain medication and accused him of "only want[ing] to get high"). Griffin also has not offered any evidence that he suffered extreme pain or permanent damage. *See Daniel v. Cook Cty.*, 833 F.3d 728, 731 (reversing district court's grant of summary judgment where plaintiff-prisoner offered evidence that treatment caused permanent damage to his hand and wrist); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 829 (7th Cir. 2009) (holding that "minor pains cannot give rise to [an Eighth Amendment] claim").

Based on these facts, no reasonable juror would find that Griffin was unconstitutionally deprived of medical care. *See, e.g.*, *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) ("What we have here is not deliberate indifference to a serious medical need, but a deliberate decision by

a doctor to treat a medical need in a particular manner. [Plaintiff] disagrees with the way that treatment was administered, but a mere disagreement with the course of the inmate's medical treatment does not constitute an Eighth Amendment claim of deliberate indifference." (internal quotation marks omitted)).

### B.     Denial of Fresh Air

Griffin also alleges that Defendants denied him fresh air and access to the outside while he was housed in the M-pod.

The Seventh Circuit has suggested that detainees have a constitutional right to "sunshine and fresh air." *Jerricks v. Schomig*, 65 F. App'x 57, 58 (7th Cir. 2003); *see also Board v. Farnham*, 394 F.3d 469, 486 (7th Cir. 2005) (recognizing constitutional right to adequate ventilation). But Griffin offers no evidence that the lack of fresh air or poor ventilation in M-pod was sufficiently serious to constitute a constitutional violation. To start, Griffin offers only his own testimony that "the ventilators is [*sic*] all clogged up." (DSMF Ex. B at 113:19–20); *see Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997) (rejecting plaintiff's "conclusory allegations, without backing from medical or scientific sources, that the rank air exposed him to diseases and caused respiratory problems which he would not otherwise have suffered"). While Defendants do not dispute that inmates housed in the medical unit had no outside access, Griffin does not claim to have suffered any physical harm or adverse health outcome. *See Gray*, 826 F.3d at 1006 (holding that a plaintiff must "show that he suffered some cognizable harm from the overall . . . environment"); *see also Davis v. Williams*, 216 F. Supp. 3d 900, 909 (N.D. Ill. 2016) (finding plaintiff raised plausible Eighth Amendment claim where he suffered a "direct physical manifestation of the harm caused by the poor ventilation"). Furthermore, the Court observes that Griffin was only temporarily housed in the M-pod while he received treatment for his orbital

fracture—a fact which weighs against his conditions of confinement claim. *See Isby v. Brown*, 856 F.3d 508, 522 (7th Cir. 2017) ("'[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards.'" (quoting *Hutto v. Finney*, 437 U.S. 678, 686 (1978))); *Gray*, 826 F. 3d at 1005 (instructing that an adverse condition's duration may affect whether it is an Eighth Amendment violation). And there is no indication that Griffin was denied outside access after August 2014, when he was no longer housed in the medical unit at WCADF.

Even if stale air or poor ventilation in M-pod was sufficiently serious to constitute a constitutional violation, Griffin cannot prove deliberate indifference. Griffin has not established that any Defendant knew that the lack of outside access posed a substantial risk to his health; he has not shown that he complained to anyone nor that he unsuccessfully requested to go outside. Therefore, there is no triable issue as to whether Defendants intentionally subjected Griffin to pain or suffering by keeping him indoors while he underwent treatment for his orbital fracture.

### C. Lights and Slamming Doors

In addition, Griffin claims that while he was housed in the M-pod, the lights stayed on all night and staff entering the unit would slam the doors, giving him a headache. As to the lights, the Seventh Circuit has held that 24-hour lighting does not objectively constitute an extreme deprivation as required for a conditions of confinement claim. *Vasquez v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008); *see also Allen v. Hardy*, No. 11 C 4147, 2012 WL 5363415, at *8 (N.D. Ill. Oct. 26, 2012) (dismissing plaintiff's claim based on "cell house lights . . . beaming on high beams 24 hours a day" where his only injury was minor sleep deprivation). With respect to the slamming doors, the Seventh Circuit has required plaintiffs to prove that the noise levels are near-constant and pose serious risk of injury. *Compare Lunsford*, 17 F.3d at 1577 n.2 & 1580

("Subjecting a prisoner to a few hours of periodic loud noises that merely annoy, rather than injure the prisoner does not demonstrate a disregard for the prisoner's welfare.") *with Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (recognizing potential due process violation where plaintiff alleged that noises occurred "every night, often all night"). Griffin's proffered evidence fails to meet this standard. And once again, Griffin has not put forward evidence that he complained about the lights or slamming doors. Nor has he otherwise shown that any Defendant had subjective knowledge of his pain and suffering. Thus, Griffin cannot prove that Defendants acted with deliberate indifference regarding the lights and slamming doors.

### D. Strip-Searches

Finally, Griffin claims that he was subjected to multiple strip-searches during which female officers were present or nearby. "A strip-search in jail or prison can be cruel and unusual punishment . . . [if] motivated by a desire to harass or humiliate rather than by a legitimate justification, such as the need for order and security in prisons." *King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015). But here, Griffin has offered no evidence that he was strip-searched for purposes of humiliation; rather, the record suggests that the strip searches occurred as part of a unit-wide shakedown. *Cf. id.* (finding that strip-search may have violated Eighth Amendment where plaintiff was only inmate targeted, there was no safety justification, and officers mocked plaintiff's nakedness). Moreover, the mere presence of female officers while a male plaintiff is nude does not constitute a constitutional violation. *See Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) ("[T]he strip search of a male prisoner in front of female officers, if conducted for a legitimate penological purpose, would fail to rise to the level of an Eighth Amendment violation."); *Johnson v. Phelan*, 69 F.3d 144, 146–48 (7th Cir. 1995) (dismissing plaintiff's complaint that female officers stood guard while he showered and noting, "[h]ow odd it would

be to find in the [E]ighth [A]mendment a right not to be seen by the other sex"). Therefore, Griffin's strip-search claim also fails.

### E. Totality of Griffin's Claims

As noted above, the Court must also evaluate Griffin's claim as a whole to determine whether his overall conditions of confinement violate his constitutional rights. In cases where the totality of adverse conditions has been found sufficient, the various allegations suggest the extreme deprivation of a single basic human need. *E.g.*, *Gray*, 826 F.3d at 1005 (finding that plaintiffs' claims of lack of access to adequate cleaning supplies and pest infestations do not individually constitute Eighth Amendment violations but, taken together, show deprivation of "basic human need of rudimentary sanitation"); *Davis*, 216 F. Supp. 3d at 906–910 (concluding that plaintiffs' complaints of contaminated water, pest infestation, inadequate ventilation, and lack of adequate cleaning supplies together indicate "sufficiently serious hygienic conditions"). By contrast, here, Griffin's allegations span a wide spectrum of issues, ranging from unsanitary conditions to lack of medical care, noise and light disturbances, and humiliation tactics. Griffin does not identify the deprivation of any specific need, instead asking the Court simply to conclude that "the conditions of confinement amounted to a constitutional violation." (Pl.'s Mem. in Resp. to Defs.' R. 56 Mot. for Summ. J. at 3, Dkt. No. 72.) Ultimately, even considered in their totality, Griffin's various claims do not amount to the denial of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Therefore, the Court grants summary judgment in favor of all Defendants as to Count II as well.

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 69) is granted in its entirety. As the Court finds that Plaintiffs cannot establish their claims on the

merits, the Court need not consider whether any individual Defendant might be entitled to the affirmative defense of qualified immunity.

ENTERED:

Dated: March 27, 2019

Andrea R. Wood
United States District Judge